# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION

LINDA J. NORWOOD AND )
THE ORANGE GROVE CENTER, INC., )
                               )
      Plaintiffs, )
                               )      CA No. 23-CV-00111 DCLC-DCH
v. )
                               )
DISABILITY RIGHTS TENNESSEE, )
                               )
      Defendant. )

## PLAINTIFFS' AMENDED VERIFIED COMPLAINT
## FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

COME NOW Plaintiffs, Linda J. Norwood ("Ms. Norwood"), conservator for John Doe ("Mr. Doe"),[1] and The Orange Grove Center, Inc. ("Orange Grove") (collectively "Plaintiffs"), by and through undersigned counsel, pursuant to 28 U.S.C. §1331, 28 U.S.C. § 2201, and Fed. R. Civ. P. 57 and 65, and for their Amended Verified Complaint for Declaratory, Injunctive, and Other Relief against Defendant Disability Rights Tennessee ("DRT"), state as follows:

## INTRODUCTION

1.      DRT asserts that, under a "federal mandate," [*see* Doc. No. 13-1, Page ID # 115], it has broad, seemingly unbounded authority to investigate neglect and abuse of individuals with intellectual and developmental disabilities (IDD) without regard to Court determined guardrails, the desires, wishes, and consent of the individual, his or her legal representative or the facility providing services to the individual, or judicial review. DRT claims that its authority derives from (1) the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("DD Act"), 42 U.S.C. § 15001, *et seq.*, and (2) the final rule ("Final Rule") promulgated by the Department of

---

[1] Conservator's conservatee is denominated as John Doe to protect his privacy.

Health and Human Services (DHHS), 45 C.F.R. §§ 1326.19 *et seq.* (2015), pursuant to DHHS' grant of authority from Congress under the DD Act and Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq.*

2.       Plaintiffs challenge the scope of DRT's actions and claimed authority pursuant to the DD Act and the Final Rule, as well as the constitutionality of the DD Act and the APA, on their face.  Plaintiffs assert that both federal statutes violate the nondelegation doctrine inherent in the Constitution and are invalid.  In the alternative, Plaintiffs contend that DHHS' interpretation and implementation of the DD Act through its Final Rule violates the DD Act and is void.

## JURISDICTION AND VENUE

3.       This Court has jurisdiction over this case pursuant to  28 U.S.C. § 1331 as a case arising under the United States Constitution, art. I, the DD Act, 42 U.S.C. §§ 15001 *et seq.*, the judicial review provisions of the APA, 5 U.S.C. §§ 702-06, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

4.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant DRT is domiciled in Tennessee, and Plaintiffs are domiciled in this district, in Chattanooga.

## PARTIES

5.       Ms. Norwood, a Tennessee-licensed attorney, is the duly appointed conservator for Mr. Doe, and has served in this capacity since her appointment on July 17, 2017. A true and accurate copy of the *Order Allowing Co-Conservators to Retire and Appoint Successor Conservator for [John Doe]* and *Letters of Conservatorship* issued by the Chancery Court for Hamilton County, Tennessee are on record with this Court.[2]  [Doc. No. 1-1, Page ID # 17-26.]

---

[2] Protected personal information has been redacted for privacy purposes and will be provided to Defendant in unredacted form.

2

6. Orange Grove is a Tennessee nonprofit corporation that serves adults and children with IDD. Orange Grove's principal place of business is in Hamilton County, Tennessee.

7. DRT is a Tennessee nonprofit corporation that provides legal advocacy services to people with IDD throughout Tennessee. DRT's principal place of business is in Davidson County, Tennessee and it may be served through its registered agent, Ann Anderson, at 2 International Plaza, Suite 825, Nashville, TN 37217.

8. Pursuant to Rule 5.1 of the Federal Rules of Civil Procedure, notice of filing of this complaint, which draws into question the constitutionality of federal statutes, will be served upon the Attorney General of the United States as required.

9. All parties having a claim or interest which would be affected by this proceeding have been joined as parties.

## FACTS

10. Mr. Doe is a deaf adult with IDD who resides in a group home operated, managed, and staffed by Orange Grove.

11. As Mr. Doe's conservator, Ms. Norwood is an agent of the Chancery Court of Hamilton County, Tennessee, and is overseen and accountable to said court. Further, Ms. Norwood took an oath, *infra*, to make decisions based upon the best interests of Mr. Doe and to never limit Mr. Doe's communication with others or access to visitors unless specifically authorized to do so by the above referenced court.

12. Mr. Doe can read written communication, but he is unable to communicate with standard American Sign Language. Rather, Mr. Doe uses many self-developed signs and gestures with which Ms. Norwood and Orange Grove staff proficiently interpret.

3

13.     Mr. Doe's residency at Orange Grove is funded by the State of Tennessee's Department of Intellectual and Developmental Disabilities ("DIDD").[3]

## DRT'S INVESTIGATION

14.     Upon information and belief, on or about February 1, 2023, an anonymous report was made to DIDD's Investigation Office that Mr. Doe was hit with a broom by an unknown staff person at Orange Grove.

15.     Upon information and belief, upon DIDD's receipt of the anonymous report, DIDD opened an investigation into the incident.

16.     On or about February 3, 2023, Ms. Norwood received, after work hours, a call on her cell phone from an unknown number.

17.     Upon Ms. Norwood's answering of the call, the male on the other line provided his name, stated that he had received reports of alleged neglect or abuse of Mr. Doe, and—only upon Ms. Norwood's inquiry—identified himself as associated with DRT.  The caller stated that DRT wanted to execute an investigation, and asked for Ms. Norwood's consent for DRT to "access" Mr. Doe's Orange Grove records.

18.     The caller did not ask to assist Ms. Norwood in resolving the situation, did not inform Ms. Norwood of any potential consequences for Mr. Doe if she did not immediately authorize access to Mr. Doe's Orange Grove records nor the full scope of consequences for Mr. Doe if DRT did gain access to said records, and did not request that she sign a Release of Information ("ROI"), itemizing which records DRT was seeking. so as to authorize DRT to obtain Mr. Doe's Orange Grove records.

---

[3] DIDD merged with the Tennessee Commission on Aging and Disability and, since July 1, 2024, is known as the Tennessee Department of Disability and Aging.

19.     As Mr. Doe's fiduciary and an agent of the court tasked with the care and protection of Mr. Doe's mental and physical well-being as well as his privacy of person and information, Ms. Norwood did not authorize the caller to access Mr. Doe's records and affirmatively declined to further discuss the matter directly with the unknown caller, who had alleged himself to be associated with DRT, an organization then unknown to Ms. Norwood.

20.     Contemporaneously with the call, and subsequently, Ms. Norwood, in her capacity as Mr. Doe's fiduciary, determined that DRT's investigative services were not needed because she understood that all incidents were affirmatively being resolved by DIDD, Orange Grove, herself, and others.

21.     Throughout February 2023, DIDD investigated the alleged incident and Mr. Doe's care at Orange Grove. Orange Grove's staff, Mr. Doe, and, upon information and belief, all known witnesses to the alleged incident were interviewed.

22.     On or about February 17, 2023, DRT directly and without notice to Ms. Norwood solicited Orange Grove for Mr. Doe's records and requested that Orange Grove send "copies of the following" to DRT by February 27, 2023:

> [t]he most recent Independent Support Plan (ISP) and any Interdisciplinary Team Meeting (IDT) notes that have occurred or addendums since the ISP, including all assessments used for the purposes of the ISP, such as speech language (SLP), physical therapy (PT), occupational therapy (OT), and behavioral therapy (BA), etc.; all daily notes by direct support staff for 2022 and 2023; all incident reports for 2022 and 2023; all medical records for 2022 and 2023, including nurse's notes, provider notes, hospital discharges, medication administration record sheets (MARS), mental health services, etc.

[Doc. 13-1, Page ID # 115.]

23.     In its correspondence of February 17, 2023, DRT did not state that it had received a complaint about Mr. Doe with regard to the status or treatment of Mr. Doe at Orange Grove, nor

did DRT state that it had probable cause to believe that Mr. Doe had been subject to abuse or neglect while at Orange Grove or that Mr. Doe's health and safety were in serious and immediate jeopardy. [*Id.*]

24.     Moreover, DRT represented to Orange Grove that "[w]hen there is probable cause to believe the health or safety of an individual is in serious and immediate jeopardy, consent for release of such records to DRT is not required where the individual has a conservator or guardian; DRT has made a good faith effort to contact the conservator/guardian and resolve the situation; and the conservator/guardian has failed or refused to act on behalf of the individual." [*Id.*]

25.     Thereafter, Orange Grove, based upon its belief that it was not required to send Mr. Doe's records to DRT, declined DRT's request.

26.     On or about February 23, 2023, DIDD determined that the specific reported allegation of abuse was unsubstantiated and that Mr. Doe's care at Orange Grove, generally, required no further action; thus, it closed its investigation. [Doc. No. 1-1, Page ID # 27.]

27.     Ms. Norwood was informed of the findings and conclusion of DIDD's investigation.

28.     On or about February 28, 2023, DRT again solicited Orange Grove, without notice to Ms. Norwood, for copies of Mr. Doe's records, requesting receipt thereof by March 1, 2023. [Doc. No. 13-1, Page ID # 119.]

29.     On or about March 3, 2023, Orange Grove replied to DRT's request, stating the following:

> We have read 45 C.F.R. § 1326.26 and do not believe we are required to send you the documents you have requested . . . [John Doe's] legal conservator is a Tennessee Licensed attorney appointed by the Court to carry out her responsibilities. If you have concerns about her performance, they should be reported to the Hamilton County Court system.

6

[Doc. No. 13-1, Page ID # 118.]

30.    On or about March 6, 2023, Ms. Norwood received a letter from DRT, alleging it received reports of abuse and neglect of Mr. Doe.  In summary, the letter stated:

a.    That DRT had "[f]ederal authority to investigate alleged instances of abuse and neglect [which] exist[ed] separate and apart from any state or provider led investigation," and that DRT "has authority to proceed with [its] investigation and get [Mr. Doe's] records without [Ms. Norwood's] assistance."  [Doc. No. 1-1, Page ID # 29.]

b.    Asked for Ms. Norwood's cooperation by signing and returning a Request of Information ("ROI") form by March 8, 2023.  [*Id.*, Page ID # 30.]

c.    That DRT would "gather records and interview appropriate parties to see if the allegations are founded. If the allegations are substantiated, [DRT] can issue an investigative report to both Orange Grove and the appropriate state agencies with appropriate recommendations to ensure that [the alleged abuse or neglect] will not happen to [Mr. Doe] . . . again."  [*Id.*]

d.    Attached a legal memorandum entitled "SUMMARY OF DISABILITY RIGHTS TENNESSEE'S AUTHORITY TO INVESTIGATE ABUSE AND NEGLECT UNDER FEDERAL LAW."  [Doc. No. 1-1, Page ID # 32-35]. Notably, this legal memorandum omitted case law with holdings disfavorable to many of its material actions during the course of events relevant in the above-styled matter.  [*Id.*]

31.    Ms. Norwood believed that DRT was not acting in good faith and intentionally misrepresented its legal authority in the correspondence.

7

32.     The ROI form that DRT requested Ms. Norwood execute provided as follows:

   a.     "I . . . give permission for Orange Grove to release the following information to [DRT] upon request . . . all records, including but not limited to, ISPs, daily notes, reportable incident forms, grievances, and invoices related to sign language interpreting from July 2022-present." [Doc. No. 1-1, PageID # 31.]

   b.     "I also authorize any employee of Orange Grove to talk with any employee of [DRT] about my information." [*Id.*]

   c.     "I also authorize any employee of [DRT] to talk about my information with any employee of Orange Grove." [*Id.*]

   d.     "I understand that I can cancel this authorization at any time by writing to [OGC] or [DRT], but that canceling this authorization does not affect any information released before the revocation is received." [*Id.*]

   e.     "I am not required to sign this authorization but I will only be provided with advocacy assistance if I do so." [*Id.*]

33.     Upon information and belief, on or about March 8, 2023, while Ms. Norwood was still evaluating her response to DRT's request for access to Mr. Doe's Orange Grove records, DRT Investigators—without any forewarning or notice to Ms. Norwood or Orange Grove—visited Mr. Doe's COVID-19 quarantined residence, accessed and searched his home, and had direct communications with Mr. Doe. [Doc. No. 13-1, Page ID # 131].

34.     Ms. Norwood believed that DRT, in visiting Mr. Doe unannounced and directly, acted outside of its authority and that DRT's actions placed her in an untenable position as a court agent and fiduciary.

35.     Specifically, Ms. Norwood believed DRT's visit, which she was unable to attend due to DRT's failure to provide her notice, was not in Mr. Doe's best interest; however, she needed court authority to both, 1) limit Mr. Doe's communications and contact with DRT and 2) act in a

8

legally significant manner to protect Mr. Doe's best interests—things she would have otherwise accomplished if given proper notice by DRT.

36. On or about March 10, 2023, Ms. Norwood, satisfied that Mr. Doe was being appropriately supervised and cared for at Orange Grove and in the belief that DRT had acted unreasonably in accessing Mr. Doe's residence and his person, responded to DRT stating the following:

> The complaints in your letter appear to be from a source that is not relying on first-hand knowledge. Several months ago, the first three complaints in your letter were investigated and addressed. Additionally, the last complaint was also investigated and found to be unsubstantiated. Consequently, I will not consent to the release of [Mr. Doe's] records.

[Doc. No. 13, Page ID # 125.]

37. On or about March 15, 2023, DRT sent Orange Grove a third request to obtain Mr. Doe's Orange Grove records. [Doc. No. 13-1, Page ID # 105.]

38. On or about March 17, 2023, Orange Grove reiterated its position to DRT and stated the following:

> We have read 45 C.F.R. § 1326.26 and do not believe we are required to send you the documents you have requested . . . [John Doe's] legal conservator is a Tennessee Licensed attorney appointed by the Court to carry out her responsibilities. If you have concerns about her performance, they should be reported to the Hamilton County Court system.

[Doc. No. 13, Page ID # 127.]

39. On or about March 22, 2023, DRT sent Orange Grove another letter. this time through its legal counsel, stating that DRT had met the requirements of the DD Act and the Final Rule because (1) DRT had received multiple reports of abuse against Mr. Doe, (2) DRT believed that there was probable cause to believe that Mr. Doe had been subject to neglect and abuse, and

9

(3) Ms. Norwood refused consent for DRT to access Mr. Doe's records. [Doc. No. 13-1, Page ID # 131.]

40.     Consequently, on the same day as DRT's request, Orange Grove offered DRT two separate and distinct forms of access to Mr. Doe and his records.

41.     First, Orange Grove offered DRT access to participate—directly and significantly—in one of Orange Grove's regular meetings with Mr. Doe and his Orange Grove support team present. Orange Grove made this offer of direct contact with Mr. Doe contingent upon Mr. Doe's and Ms. Norwood's consent. The details of this offer were stated as follows:

> If DRT would like to be a part of a team meeting you would be welcome to participate. With his and his conservator's consent, your staff could talk to him and his supports and hear first hand where we are with our planning and attempts to support his needs. You could also provide any suggestions or input.

[Doc. No. 13-1, Page ID # 136.]

42.     Second, Tera Roberts ("Ms. Roberts"), CEO of Orange Grove, "further invit[ed] [DRT] to schedule a time with [Ms. Roberts to] sit with [her] and [Mr. Doe's] records [and] read them." *Id.*

43.     On or about March 22, 2023, DRT responded to Orange Grove's offer, stating:

a.      "We do not need Ms. Norwood's consent to do so since she refused to cooperate."

b.      "DRT is allowed to make unannounced visits to the home of [Mr. Doe] per federal statute."

c.      "Your offer of visual inspection is not acceptable."

[Doc. No 13-1, Page ID # 135.]

44.     Subsequently, for the reasons previously stated to DRT, Orange Grove did not send copies of Mr. Doe's records to DRT.

10

45.     Thereafter, on or about March 27, 2023, DRT sent further correspondence to Ms. Roberts, advising her that DRT intended to "send an investigator to [Orange Grove's] office on Wednesday [3/29/2023], at 10 a.m. ET to view and copy/scan the records." [Doc. No. 13-1, Page ID # 140.]

46.     In reply, Ms. Roberts advised DRT that she was unavailable to meet on March 29, and that "[p]ursuant to the court appointed conservator's letter on March 10th, [Orange Grove] decline[s] to produce the requested records." [Doc. No. 13-1, Page ID # 145.]

47.     Orange Grove never rescinded its consent to allow DRT access to Mr. Doe's records at Orange Grove, or access to Mr. Doe or the staff at Orange Grove to assist in DRT's investigation.

48.     Orange Grove did not receive a request from DRT to reschedule the appointment or to meet with Orange Grove personnel at another time.

49.     On or about March 28, 2023, Orange Grove informed Ms. Norwood that Orange Grove believed that "DRT does not have the authority to supersede [Ms. Norwood's] authority and if they do, we will need to go through the appropriate legal channels with them." Exhibit A.

50.     On or about April 21, 2023, Orange Grove received a letter and draft complaint from DRT, threatening that if it did not produce Mr. Doe's records, then the draft complaint would be filed against Ms. Roberts, personally, and Orange Grove. [Doc. No. 1-1, Page ID # 37-56.]

51.     The draft complaint requested, among other relief, preliminary and permanent injunctive relief against Orange Grove enjoining it from denying DRT access to Mr. Doe's records "and other records of individuals with disabilities served by Orange Grove." [Doc. No. 1-1, Page ID # 55.]

52.     Ms. Norwood instructed Orange Grove that she did not consent to the release of any such information of Mr. Doe and that she too believed DRT did not have the authority to supersede her authority as an agent of the Hamilton County Chancery Court.

53.     Therefore, on or about April 27, 2023, Ms. Norwood, as a subordinate agent of the Chancery Court of Hamilton County, Tennessee, filed, as permitted by Court Order, *see* Exhibit B, a complaint requesting a Restraining Order, Temporary Injunction, and Declaratory Judgment against DRT and Orange Grove in order to have the rights and other legal relations of all parties declared concerning the entirety of DRT's actions—namely, its unreasonable direct access to Mr. Doe's person, its desired access to all of Mr. Doe's Orange Grove records, and its desired means of accessing and possessing Mr. Doe's Orange Grove records.

54.     On or about January 30, 2024 and February 5, 2024, Ms. Norwood received communications from DRT alleging receipt of additional reports of abuse and/or neglect of Mr. Doe, and requesting that Ms. Norwood authorize DRT to access Mr. Doe's Orange Grove records. [Doc. No. 38, Page ID # 359.]

55.     Due to the on-going pendency of the above-styled matter, Ms. Norwood's actions related thereto, and Ms. Norwood's active care of Mr. Doe,  Ms. Norwood did not respond to DRT's requests.

56.     On or about February 6, 2024, Orange Grove received correspondence from DRT alleging receipt of additional reports of abuse and/or neglect of Mr. Doe and demanding that Orange Grove provide copies of Mr. Doe's Orange Grove records to DRT.  [Doc. No. 38, Page ID # 345.]

57.     On or about February 8, 2024, Orange Grove denied DRT's request for copies of Mr. Doe's Orange Grove records in light of the on-going pendency of this matter. [Doc. No. 38, Page ID # 348.]

58.     With DRT's investigation ongoing, Plaintiffs fear that DRT may seek access to Mr. Doe or other individuals at Orange Grove in order to encourage them to engage in potentially emotionally-taxing "legal, administrative, [or] other… [unknown] remedies" not in Mr. Doe's best interests.  42 U.S.C. § 15043(a)(2)(A)(i).

## TENNESSEE CONSERVATORSHIP LAW

59.     A conservator is a person appointed by the court to exercise the decision-making rights and duties of a person the court has determined to be disabled. T.C.A. § 34-1-101. Additionally, conservators are agents of the court, in a fiduciary capacity, and are overseen and accountable to the court.

60.     Pursuant to Tennessee law, before being appointed a conservator, the conservator must take an oath for the faithful performance of his or her fiduciary duties.  Said oath includes, but is not limited, to the following:

> I will follow the orders of the court. I understand that if an authority is not specifically listed in the court's order, then I cannot make the decision on behalf of the respondent . . . I PROMISE I WILL: Make decisions based upon the best interest of the respondent . . . I PROMISE I WILL NOT. . . Limit the respondent's communication with others or access to visitors unless specifically authorized to do so by the court.

T. C. A. § 34-1-109 (emphasis in original).

61.     Pursuant to T.C.A. § 34-1-129, Letters of Conservatorship issued to a conservator over the person and property of a conservatee specifically state the following:

> The following rights of THE [CONSERVATEE] are transferred to the CONSERVATOR . . . [the right] to authorize or not disclosures

13

of medical, personal and financial information . . . [the right] to do any other act of legal significance for the benefit of THE [CONSERVATEE].

## ORANGE GROVE'S INTERNAL POLICIES

62.     Orange Grove's internal policy, "Rights of the Individuals," ("Rights Policy") governs its services to individuals with IDD. The Rights Policy focuses on community integration, living arrangements, individualized care, and ensuring "services are performed in the least restrictive environment available." The Rights Policy includes, but is not limited to, the following individual rights:

> 1. Provide options for community integration . . . 2. To come and go at any time with no curfew . . . 3. To have access to transportation, public or other resources . . . 4. To have the opportunity to shop, go out to eat, visit family and friends, and attend events in their community as they choose . . . 5. To regularly access their community . . . 33. Be treated with respect and dignity as a human being . . . 35. Have prompt and confidential services . . . 38. Be encouraged to take part in planning your own health care treatment . . . 48. Be free to pursue . . . religious expression as desired . . . 50. Participate in social, religious, and community activities of your choice . . . 51. Keep or have access to your own money . . . 54. NOT have items searched unless consent is given . . . 60. Have the right to attend, or not attend, and have whomever you choose to participate in your Individual Support Plan meetings.

Exhibit C (emphasis in original).

63.     On or about March 8, 2023, when DRT made its unannounced visit to Mr. Doe, Orange Grove's internal COVID-19 policy included the following protocols:

> -      Any person who has symptoms consistent with COVID-19 (a fever of 100 degrees or greater, fever, cough, shortness of breath, headache, sore throat, body aches, fatigue, loss of taste/smell, diarrhea, congestion or runny nose) must isolate at home until a negative COVID-19 test can be secured AND must be fever-free (without the use of fever-reducing medications) AND without symptoms for at least 24 hours prior to returning to normal activities.

14

- Any person who has been diagnosed with COVID-19 must isolate at home for at least 5 days and until a negative COVID-19 test can be secured.

- Any person who has been in close contact (within 6 feet for more than 15 minutes) of a person with suspected or confirmed COVID-19 must quarantine at home for a period of 5 days from their last exposure to that individual or 7 days if exposure is on-going from a household member.

- Social distancing is encouraged when possible. Due to the nature of instruction, it may not always be possible to maintain 6 feet of distancing. Orange Grove mitigates these risks by providing and requiring the use of PPE for staff.

64. In caring for Mr. Doe, Orange Grove (and Ms. Norwood) are governed by Orange Grove's "Rights of the Individuals" and COVID-19 policy.

65. DRT's unannounced and unaccompanied visit to Mr. Doe at his group home, where he resided with other individuals with IDD, was in flagrant disregard for these rights and policies, and was unreasonable in light of the circumstances.

## THE DD ACT

66. The DD Act was enacted in 1963, and last reformed in 2000. Developmental Disabilities Assistance and Bill of Rights Act of 2000, Pub. L. No. 106-402, 114 Stat. 1677 (2000).

67. In enacting the DD Act and establishing watchdogs for historically vulnerable individuals, Congress intended that a person with IDD would be treated individually and that "any assistance to such individuals should be provided in an *individualized manner*, consistent with the unique strengths, resources, priorities, concerns abilities, and capabilities of such individuals." 42 U.S.C. § 15001(c)(2) (emphasis added).

68. Congress also recognized that "individuals with developmental disabilities and their families are the primary decisionmakers regarding the services and supports such individuals

15

and their families receive, … and *play decisionmaking roles* in policies and programs that affect the lives of such individuals and their families[.]" 42 U.S.C. § 15001(c)(3) (emphasis added).

69.     Congress sought to implement a system that created greater oversight, protections and advocacy for individuals with disabilities, while also encouraging the individual's "self-determination, independence, productivity, and integration and inclusion in all facets of community life[.]" 42 U.S.C. § 15001(b)(1).

70.     In balancing these interests, Congress established prerequisites that must be satisfied, and that constrain, a P & A's investigative authority and conduct.

71.     Concerning access to an individual, the DD Act provides that a P & A system shall:

> (H) have access *at reasonable times* to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual, in order to carry out the purpose of this subtitle. [42 USCS §§ 15041 *et seq.*].

42 U.S.C. § 15043(a)(2)(H) (emphasis added).

72.     There is no explicit requirement in the DD Act that a P & A request or acquire consent from a legal representative before it gains access to an individual. *Id.*

73.     There is also no explicit requirement that access to an individual be unaccompanied, unannounced or unscheduled. *Id.*

74.     Rather, the circumstances then present should be considered in determining what is a reasonable time.

75.     The DD Act also authorizes a P & A to access an individual's records relevant to its investigation of neglect or abuse.

76.     In the DD Act, a "record" is defined as:

> (1) a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilities;

16

(2) a report prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury, or death occurring at such location, that describes such incidents and the steps taken to investigate such incidents; and

(3) a discharge planning record.

42 U.S.C. § 15043(c).

77.    Concerning when access to records of an individual with a conservator is allowed, the DD Act provides that a P & A system shall:

(I)    have access to all records of—

(i) any individual with a developmental disability who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;

. . .

(iii) any individual with a developmental disability, in a situation in which-

(I) the individual *has* a legal guardian, *conservator*, or other legal representative;

(II) a complaint has been received by the system about the individual with regard to the status or treatment of the individual or, as a result of monitoring or other activities, there is probable cause to believe that such individual has been subject to abuse or neglect;

(III) such representative has been contacted by such system, upon receipt of the name and address of such representative;

(IV) such system *has offered assistance to such representative to resolve the situation*; and

(V) such representative has *failed or refused to act* on behalf of the individual;

42 U.S.C. § 15043(a)(2)(I)(iii) (emphasis added).

78.    The DD Act does not define a representative's refusal to give consent as a failure or refusal to act on behalf of the individual.

17

79.     Furthermore, the DD Act provides that a P & A system shall:

> (J) . . . (i) have access to the records of individuals described in subparagraphs (B) and (I), *and other records that are relevant to conducting an investigation*, under the circumstances described in those subparagraphs, not later than 3 business days after the system makes a written request for the records involved[.]

42 U.S.C. § 15043(a)(2)(J) (emphasis added).

80.     Pursuant to the DD Act, Congress based access to a conservatee's records on two distinct condition precedents:  (1) "authorization" from the conservator or (2) a conservator's failure or refusal to act affirmatively on behalf of the conservatee to resolve the situation (i.e. "has offered assistance to [the conservator] to resolve the situation" and the conservator "has failed or refused to act on behalf of the individual").  42 U.S.C. § 15043(a)(2)(I)(i), (iii).

81.     Under the DD Act, judicial review is the sole avenue for relief available to an individual with IDD or to a legal guardian because no administrative adjudication is afforded under the Act.

## THE DHHS FINAL RULE

82.     In the DD Act, Congress commanded that the DHHS Secretary, "shall promulgate such regulations as may be required for the implementation of this title [42 USCS §§ 15001 *et seq.*]" no later than one year from enactment.  42 U.S.C. § 15004(b).

83.     In 2015, the DHHS Secretary issued its Final Rule, which became effective August 26, 2015, to "align the regulations and current statute" given the DD Act's amendment in 2000. 80 Fed. Reg. 143, 44796 (July 27, 2015).

84.     In the Final Rule, DHHS promulgated regulations concerning a P & A system's access to individuals with IDD and service providers pursuant Section 15043(a)(2)(H) of the DD Act.

85.     The regulations issued include, but are not limited to:

18

(b)     The P&A system shall have reasonable *unaccompanied* access to individuals with developmental disabilities *at all times necessary* to conduct a full investigation of an incident of abuse or neglect.

> (1)     Such access shall be afforded upon request, by the P&A system when:
>
>> (i) An incident is reported or a complaint is made to the P&A system;
>>
>> (ii) The P&A system determines that there is probable cause to believe that an incident has or may have occurred; or
>>
>> (iii) The P&A system determines that there is or may be imminent danger of serious abuse or neglect of an individual with a developmental disability.
>
> (2)     A P&A system shall have *reasonable unaccompanied* access to public and private service providers, programs in the State, and to *all areas* of the service provider's premises that are used by individuals with developmental disabilities or are accessible to them. Such access shall be provided *without advance notice and made available immediately upon request*. This authority shall include the opportunity to interview *any* individual with developmental disability, employee, or other persons, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation. The P&A *may not* be required to provide the name or other identifying information regarding the individual with developmental disability or staff with whom it plans to meet; *neither may* the P&A be required *to justify or explain* its interaction with such persons.

. . .

(d)     *Unaccompanied access* to individuals with developmental disabilities including, but not limited to, the opportunity to meet and communicate *privately* with individuals *regularly*, both formally and informally, by telephone, mail and *in person*. This authority shall also include the opportunity to meet, communicate with, or interview *any individual with a developmental disability*, including a person thought to be the subject of abuse, who might be reasonably

19

believed by the P&A system to have knowledge of an incident under investigation or non-compliance with respect to the rights and safety of individuals with developmental disabilities. Except as otherwise required by law the P&A shall *not be required* to provide the name or other identifying information regarding the individual with a disability with whom it plans to meet; *neither may* the P&A be *required to justify or explain* its interaction with such persons.

45 C.F.R. § 1326.27 (emphasis added).

86.     Likewise, DHHS promulgated regulations governing a P & A system's access to records of individuals with IDD pursuant to Section 15043(a)(2)(I) of the DD Act.

87.     These regulations include, but are not limited to, a P & A system having "access to the records of individuals . . . under the following circumstances:"

> (1)     If *authorized* by an individual who is a client of the system, or who has requested assistance from the system, or by such individual's legal guardian, *conservator* or other legal representative.
>
> . . .
>
> (3)     In the case of an individual, who has a legal guardian, *conservator*, or other legal representative, about whom a complaint has been received by the system or, as a result of monitoring or other activities, the system has determined that there is probable cause to believe that the individual with developmental disability has been subject to abuse or neglect, whenever the following conditions exist:
>
> (i) The P&A system has made a good faith effort to contact the legal guardian, conservator, or other legal representative upon prompt receipt (within the timelines set forth in paragraph (c) of this section) of the contact information (which is required to include but not limited to name, address, telephone numbers, and email address) of the legal guardian, conservator, or other legal representative;
>
> (ii) The system has *offered assistance* to the legal guardian, conservator, or other legal representative *to resolve the situation*; and

20

(iii) The legal guardian, conservator, or other legal representative has failed or refused *to provide consent* on behalf of the individual.

(4)     If the P&A determines there is probable cause to believe that the health or safety of an individual is in serious and immediate jeopardy, no consent from another party is needed.

(5)     In the case of death, *no consent from another party is needed. Probable cause* to believe that the death of an individual with a developmental disability resulted from abuse or neglect or any other specific cause *is not required* for the P&A system to obtain access to the records. *Any individual* who dies in a situation in which services, supports, or other assistance are, have been, or may customarily be provided to individuals with developmental disabilities shall, for the purposes of the P&A system obtaining access to the individual's records, *be deemed* an "individual with a developmental disability."

45 C.F.R. § 1326.25 (emphasis added).

88.     These regulations further include what constitutes a record:

(b) Individual records to which P&A systems must have access under section 143(a)(2), (A)(i), (B), (I), and (J) of the Act (whether written or in another medium, draft, preliminary or final, including handwritten notes, electronic files, photographs or video or audiotape records) shall include, but shall not be limited to:

(1) Individual records prepared or received in the course of providing intake, assessment, evaluation, education, training and other services; supports or assistance, including medical records, financial records, and monitoring and other reports prepared or received by a service provider. This includes records stored or maintained at sites other than that of the service provider, as well as records that were not prepared by the service provider, but received by the service provider from other service providers.

(2) Reports prepared by a Federal, State or local governmental agency, or a private organization charged with investigating incidents of abuse or neglect, injury or death. The organizations whose reports are subject to this requirement include, but are not limited to, agencies in the

21

foster care systems, developmental disabilities systems, prison and jail systems, public and private educational systems, emergency shelters, criminal and civil law enforcement agencies such as police departments, agencies overseeing juvenile justice facilities, juvenile detention facilities, all pre- and post- adjudication juvenile facilities, State and Federal licensing and certification agencies, and private accreditation organizations such as the Joint Commission on the Accreditation of Health Care Organizations or by medical care evaluation or peer review committees, regardless of whether they are protected by federal or state law. The reports subject to this requirement describe any or all of the following:

> (i) The incidents of abuse, neglect, injury, and/or death;

> (ii) The steps taken to investigate the incidents;

> (iii) Reports and records, including personnel records, prepared or maintained by the service provider in connection with such reports of incidents; or,

> (iv) Supporting information that was relied upon in creating a report including all information and records that describe persons who were interviewed, physical and documentary evidence that was reviewed, and the related investigative findings;

(3) Discharge planning records; and

(4) Information in professional, performance, building or other safety standards, and demographic and statistical information relating to a service provider.

45 C.F.R. § 1326.25(b).

89. Through the Final Rule, and in particular the provision stated above, DHHS has created regulations that impermissibly expand its authority, and the authority of P & A agencies acting beneath it, beyond Congress' legislative intent.

90. The Final Rule permits a P & A unaccompanied access to an individual with IDD without regard to the circumstances then existing and whether it is reasonable.

91. The Final Rule nullifies the two distinct condition precedents which trigger a P & A's records access when an individual with IDD has a conservator—failure or refusal to act—into a single narrow action of "consent."

92. The Final Rule expands the definition of records that a P & A may access.

93. Plaintiffs contend that DHHS' expansion of its authority through its Final Rule is arbitrary, capricious, an abuse of discretion or otherwise unlawful, and extends well beyond the authority delegated to DHHS pursuant to the DD Act.

## THE APA

94. Congress enacted the APA in 1946. 5 U.S.C. § 551 *et seq.*

95. Through the APA, Congress authorized United States' executive agencies with the ability to interpret statutes, promulgate rules and regulations, and adjudicate disputes regarding their own promulgated regulations. *Id.*

96. "[A]s a practical matter [executive agencies] exercise legislative power, by promulgating regulations with the force of law; executive power, by policing compliance with those regulations; and judicial power, by adjudicating enforcement actions and imposing sanctions on those found to have violated their rules." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 312-13 (2013) (Roberts, J., C.J., dissenting).

97. Congress' statutory delegation of authority to executive agencies through the APA violates the Constitution's assignment of all legislative power to Congress, regardless of whether Congress has provided by legislative act an intelligible principle to which the agency authorized to act is directed to conform.

23

98. Alternatively, in the DD Act, Congress directed the Secretary of DHHS to promulgate "regulations as may be required for the implementation" of the DD Act. 42 U.S.C.A. § 15004(b).

99. This statutory directive does not articulate any policy or standard to confine the Secretary's discretion and is therefore unconstitutional on its face.

100. The Secretary promulgated the Final Rule upon which DRT rests its authority, in particular the provisions of Sections 1326.25 through 1326.27.

101. The Secretary acknowledges in the Final Rule that the court remains the "final arbiter" with respect to determining whether an adequate basis exists for probable cause. 80 Fed. R. at 44800.

102. By extension, pursuant to the APA, 5 U.S.C. § 706(2), a reviewing court shall hold unlawful and set aside any agency action, findings, and conclusions found to be:

(A)   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)   contrary to constitutional right, power, privilege, or immunity;

(C)   in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)   without observance of procedure required by law;

(E)   unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)   unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

103. Plaintiffs are permitted, therefore, pursuant to the DD Act and the APA, to pursue judicial review of DRT's actions and DHHS' Final Rule.

24

**CAUSES OF ACTION**

**COUNT I – UNCONSTITUTIONALITY OF THE APA**

104.    Plaintiffs incorporate herein the foregoing allegations contained in Paragraphs 1 through Paragraphs 103.

105.    Article I, § 1 of the Constitution vests "[a]ll legislative Powers" of the United States solely "in the Congress of the United States." U.S. Const. art. I, § 1.

106.    The Supreme Court has determined that this clause bars congressional delegations of power which are strictly and exclusively legislative to any other branch of government. This principle is known as the nondelegation doctrine.

107.    Congress, through the APA, delegated to executive agencies its legislative power to promulgate regulation and codify it in the Code of Federal Regulations. 5 U.S.C. §§ 500-1014.

108.    In practice, these agency regulations are treated as law and used by executive agencies, such as DRT, to expand their authority, to execute upon their expanded authority, and, in so doing, invade principles of liberty.

109.    The APA violates Article I, § 1 of the Constitution because Congress' legislative powers are non-delegable, and the APA arbitrarily, capriciously, and improperly delegates legislative powers to the United States' executive branch.

**COUNT II – UNCONSTITUTIONALITY OF THE DD ACT**

110.    Plaintiffs incorporate herein the foregoing allegations contained in Paragraphs 1 through Paragraphs 109.

111.    In addition to the APA, Congress, through the DD Act, delegated its legislative power to the executive branch when it directed that "[e]xcept as otherwise expressly provided in this title [42 USCS §§ 15001 et seq.], the Secretary, not later than 1 year after the date of enactment

25

of this Act [enacted Oct. 30, 2000], *shall promulgate such regulations as may be required for the implementation of this title* [42 USCS §§ 15001 et seq.]." 42 U.S.C. § 15004(b) (emphasis added).

112. The DD Act violates Article I, § 1 of the Constitution because Congress' legislative powers are non-delegable, and the DD Act arbitrarily, capriciously, and improperly delegates legislative powers to the United States' executive branch.

113. Additionally, and in the alternative, the DD Act is unconstitutional on its face because Congress did not lay down an intelligible principle to sufficiently guide DHHS' discretion to accord with Article I of the Constitution.

114. As a direct and proximate result of Congress' violation of Article I, § 1 of the Constitution, the APA and DD Act are facially unconstitutional and therefore invalid.

## COUNT III – INVALIDITY OF DHHS' FINAL RULE

115. Plaintiffs incorporate herein the foregoing allegations contained in Paragraphs 1 through Paragraphs 114.

116. Unless determined otherwise by this Court, the APA authorizes executive agencies to interpret statutes, promulgate regulations, and interpret and enforce their own promulgated regulations. 5 U.S.C. § 551 *et seq.* It also prescribes necessary procedures to which the agencies must adhere in doing so. *Id.*, §§ 551-59.

117. Congress, through the APA, tasked the Secretary of DHHS with promulgating "regulations as may be required for the implementation" of the DD Act. 42 U.S.C. § 15004(b).

118. An agency of the federal government is only empowered to act within the statutory guidelines establishing its power; "any action exceeding its statutory authority is void." *Tenaska Wash. Partners, L.P. v. United States*, 34 Fed. Cl. 434, 440 (1995) (quoting *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990)).

26

119. Thus, even if DHHS was within its authority to promulgate regulations that implement the DD Act, it can only issue regulations that are within the statutory authority bestowed to it by the DD Act.

120. The DHHS Secretary promulgated the regulations at issue in this matter, including without limitation, 45 C.F.R. § 1326.25 and § 1326.27.

121. The Secretary's interpretation of the DD Act is erroneous and extends its authority beyond the purpose and intent of the DD Act.

122. 45 C.F.R § 1326.25(a)(3)(iii) impermissibly expands the DD Act by permitting access to records where the conservator "has failed or refused to provide consent on behalf of the individual."

123. DHHS' expansion of the DD Act to equate withholding consent with failure or refusal to act on behalf of the individual is not based on congressional intent or legislative history.

124. 45 C.F.R. § 1326.25(b) impermissibly expands the DD Act by redefining what constitutes a record pursuant to the DD Act.

125. 45 C.F.R. § 1326.27(b) impermissibly expands the DD Act by permitting unaccompanied access to individuals with developmental disabilities at all times necessary to conduct a full investigation of an incident of abuse or neglect.

126. 45 C.F.R. § 1326.27(b)(2) impermissibly expands the DD Act by permitting unaccompanied access to public and private service providers, programs in the State, and to all areas of the service provider's premises that are used by individuals with developmental disabilities or are accessible to them. Such access shall be provided without advance notice and made available immediately upon request.

27

127.     45 C.F.R. §§ 1326.25 and 1326.27 are arbitrary, capricious, and extend well beyond the claimed authority delegated to DHHS pursuant to the APA.

128.     DHHS' misinterpretation of the DD Act is beyond its statutory authority, and therefore renders the Final Rule void.

### COUNT IV – VIOLATION OF THE DD ACT BY DRT

129.     Plaintiffs incorporate herein the foregoing allegations contained in Paragraphs 1 through Paragraphs 128.

130.     DRT is a P & A system created and governed by the DD Act. *See* 42 U.S.C. § 15043.

131.     DRT's authority is prescribed by the DD Act, and any action beyond the scope of the DD Act's grant of authority is unlawful.

132.     DRT violated the DD Act by acting beyond the authority granted to it pursuant to the DD Act and by behaving arbitrarily and capriciously under the color of law in numerous ways, including, but not limited to, the following:

    a.     DRT did not offer assistance to Ms. Norwood to resolve the situation; rather, DRT asked for Ms. Norwood's assistance;

    b.     DRT, without fulfilling its duty to offer assistance to Ms. Norwood, communicated to Orange Grove it had authority access to Mr. Doe's records because Ms. Norwood failed to act;

    c.     DRT provided Ms. Norwood with a misleading legal memo;

    d.     DRT asked for records of Mr. Doe that were unnecessary to investigate the alleged incident(s);

28

e.    DRT unreasonably visited Mr. Doe, searched his residence, and did so without providing notice to Ms. Norwood or Orange Grove;

f.    DRT misrepresented to Ms. Norwood and Orange Grove the scope of its authority, the scope of the consequences to Mr. Doe, and the legal bases for its purported authority; and

g.    DRT misrepresented its authority when it requested access to the records of every individual with IDD that Orange Grove serves without meeting any condition precedents pursuant to the DD Act to trigger access authority to these individuals' records.

133.    The DD Act requires, at a minimum, that a P & A receive a complaint or determine that it has probable cause before it can access an individual's records. 42 U.S.C. § 15043(a)(2)(I).

134.    The DD Act does not authorize a P & A access to every facility resident's records on the basis of a complaint received about one specific individual.

135.    DRT's assertion that it is entitled to access to every Orange Grove's resident's records is clearly outside the bounds of its statutory authority pursuant to the DD Act and its regulatory authority under the Final Rule.

136.    As a direct and proximate result of DRT's violation of the DD Act and the Final Rule, Plaintiffs have suffered and will continue to suffer harm.

## COUNT V – DECLARATORY JUDGMENT

137.    Plaintiffs incorporate herein the foregoing allegations contained in Paragraphs 1 through Paragraphs 136.

29

138. There is a genuine case and controversy existing between the parties, as evidenced by the referenced and incorporated allegations contained in the preceding paragraphs. 28 U.S.C. §§ 2201-02.

139. DRT alleges that, pursuant to 45 C.F.R. §§ 1326.21-1326.27, it is entitled to unfettered and unannounced access to Mr. Doe's person and residence as well as access to and copies of all of Mr. Doe's Orange Grove records for the purposes of investigating alleged abuse.

140. Additionally, DRT alleges that it is authorized to access all the records of any individual at Orange Grove and requests a permanent injunction allowing it such access.

141. Plaintiffs allege that DRT has overstepped its authority pursuant to the DD Act in its investigation of Mr. Doe's care at Orange Grove and through its request for permanent injunctive relief to access all records of any individual at Orange Grove.

142. Plaintiffs request, pursuant to the judicial review authority granted by the APA, 5 U.S.C. §§ 702-06 and the Declaratory Judgment Act, that the Court declare the rights and other legal relations of all parties concerning the entirety of DRT's actions pursuant to all applicable laws and regulations, including 42 U.S.C.A. § 15043 and 45 C.F.R. §§ 1326.21-.27.

### COUNT VI – PRELIMINARY INJUNCTION

143. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 142.

144. The unlawful actions of DRT alleged herein have immediately harmed and continue to harm Plaintiffs' interests and rights pursuant to the Constitution and the DD Act.

145. Without the entry of an order enjoining DRT from access to Mr. Doe and his records at Orange Grove, Plaintiffs will continue to suffer immediate irreparable harm for which money damages are insufficient.

146.     If the private and personal records of Mr. Doe are released to DRT and/or his person is accessed by DRT, then Mr. Doe's liberty, his individual rights pursuant to the DD Act, and Orange Grove's policies would be violated and Mr. Doe will suffer immediate and irreparable harm.

147.     Additionally, if DRT is permitted to access other individuals' records at Orange Grove without due regard for the requirements of the DD Act, those individuals' liberty and individual rights will also be violated and they will suffer immediate and irreparable harm.

148.     Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs are entitled to obtain from the Court a preliminary injunction enjoining the release of Mr. Doe's Orange Grove records without Ms. Norwood's consent or a judicial order; enjoining DRT from accessing Mr. Doe's person or residence without Ms. Norwood's consent or a judicial order; and enjoining DRT from accessing any other individual's records at Orange Grove without satisfying the requirements of the DD Act.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiffs Linda J. Norwood and The Orange Grove Center, Inc. respectfully pray that this Court grant the following relief and declare the rights of the parties as follows:

i.     That the APA be held unconstitutional on its face;

ii.     That the DD Act be held unconstitutional on its face;

iii.     That the DHHS Final Rule be held invalid;

iv.     That judgment be entered against DRT for violating the DD Act;

v.     That the Court issue a preliminary injunction enjoining DRT from:

31

a. accessing, copying, or receiving in any way, any Orange Grove records of Mr. Doe without Ms. Norwood's consent or by judicial order;

b. prohibiting DRT from access to Mr. Doe or his residence without the consent of Ms. Norwood or by judicial order; and

c. prohibiting DRT from accessing any other individual's records without satisfying the requirements of the DD Act;

vi. That the Court determine, through a declaratory judgment, the rights of the parties; and

vii. That Plaintiffs have such other and further relief as the Court may deem just and proper.

**THIS IS THE FIRST APPLICATION FOR EXTRAORDINARY RELIEF AND NO COURT HAS PREVIOUSLY REFUSED THE RELIEF SOUGHT.**

Respectfully submitted,

MCKOON WILLIAMS ATCHLEY & STULCE, PLLC

By: ___/s/ Zachary Atchley___
Fielding Atchley, BPR #001310
Zachary Atchley, BPR #040892
633 Chestnut Street, Suite 1500
Chattanooga, TN 37450
Telephone: (423) 756-6400
fatchley@mwalawfirm.com
zatchley@mwalawfirm.com
(Counsel for Plaintiff Norwood)

GRANT, KONVALINKA & HARRISON, P.C.

By: ___/s/April H. Sawhill___
John P. Konvalinka, BPR #001780
April H. Sawhill, BPR #039906

32

633 Chestnut Street, Suite 900
Chattanooga, TN 37450
Telephone: (423) 756-8400
jkonvalinka@gkhpc.com
asawhill@gkhpc.com
(Counsel for Plaintiff Orange Grove)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically on the 2nd day of August 2024. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

/s/April H. Sawhill
April H. Sawhill

STATE OF TENNESSEE:

COUNTY OF HAMILTON:

      Plaintiff first being duly sworn, makes oath that the statements contained in the foregoing

Complaint are true to the best of her knowledge, information and belief, for the causes mentioned

and contained in said Complaint.

LINDA NORWOOD, AFFIANT

Sworn to and subscribed before me this the _15th_ day of July, 2024.

Notary Public

My Commission Expires: _May 17, 202__

STATE OF TENNESSEE:

COUNTY OF HAMILTON:

Plaintiff first being duly sworn, makes oath that the statements contained in the foregoing

Complaint are true to the best of her knowledge, information and belief, for the causes mentioned

and contained in said Complaint.

TERA ROBERTS, AFFIANT

Sworn to and subscribed before me this the 2nd day of August, 2024.

Notary Public
My Commission Expires: 01/02/2028